1  Edward C. Walton (Bar No. 78490)
E-mail:      ed.walton@procopio.com
2  Patrick W. Martin (Bar No. 163932)
E-mail:      patrick.martin@procopio.com
3  Eric D. Swenson (Bar No. 196362)
E-mail:      eric.swenson@procopio.com
4  PROCOPIO, CORY, HARGREAVES &
    SAVITCH LLP
5  525 B Street, Suite 2200
San Diego, CA 92101
6  Telephone: 619.238.1900
Facsimile: 619.235.0398
7
Attorneys for Plaintiff Margaret J. Jones, as Executor
8  of the Estate of Jeffrey L. Jones

9                UNITED STATES DISTRICT COURT

10         FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  MARGARET J. JONES, as Executor,        Case No. 2:19-cv-00173
    ESTATE OF JEFFREY L. JONES,
12                                         **COMPLAINT FOR ILLEGAL**
             Plaintiff,                    **EXACTION**
13
    v.
14
    THE UNITED STATES OF AMERICA,
15  DEPARTMENT OF THE TREASURY,
    INTERNAL REVENUE SERVICE,
16
             Defendant.
17

18

19              **CIVIL ACTION COMPLAINT**

20         Plaintiff, Margaret J. Jones, as Executor of the Estate of Jeffrey L. Jones, by

21  and through Plaintiff's attorneys, hereby brings this civil action complaint against the

22  United States of America, Department of the Treasury, Internal Revenue Service for

23  the return of funds paid by, but illegally exacted or taken from the Plaintiff in

24  contravention of a statute of the United States.

25                         **PARTIES**

26         1.    Plaintiff is Margaret J. Jones ("**Margaret**"), in her capacity as Executor

27  of the Estate of Jeffrey L. Jones ("**Jeffrey**" or the "**Estate of Jeffrey**").  Margaret is

28

1  the 90-year old widow of Jeffrey, who died in March 2013.  Plaintiff's address is

2  2890 Sailor Avenue, Ventura, California 93001.

3       2.     Defendant is the United States of America, Department of the Treasury,

4  Internal Revenue Service ("**IRS**").

5  **VENUE AND JURISDICTION**

6       3.     This Court has jurisdiction over the subject matter of this action

7  pursuant to 28 U.S.C. § 1346(a)(2) and 28 U.S.C. § 1355(a).

8       4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and (b).

9  **PRELIMINARY STATEMENT**

10       5.     This action concerns an illegal exaction of $4,878.95, which is part of

11  the total amount of $1,890,074 that the IRS erroneously "assessed" against the Estate

12  of Jeffrey for the inadvertent non-filing of a Report of Foreign Bank and Financial

13  Accounts ("**FBAR**") for the year 2011 pursuant to 31 U.S.C. § 5321.

14       6.     The IRS's Examination Division (the "**Examination Division**") was

15  unable to find after a two-year audit (the "**Examination**") that Jeffrey, a New

16  Zealand and U.S. citizen, had actual knowledge of a duty to file an FBAR for certain

17  investment accounts he held individually in New Zealand during 2011.  Nonetheless,

18  the Examination Division unfairly (and incorrectly) determined that Jeffrey was

19  somehow "willfully blind" or had "reckless disregard" as to such FBAR filing

20  requirement.

21       7.     Plaintiff is informed and believes and thereon alleges that Jeffrey's

22  failure to file an FBAR for the year 2011 was unintentional and inadvertent, a good

23  faith misunderstanding, and certainly not "willful" (under any definition or

24  construction of the term "willfulness").  Margaret, who was married to Jeffrey for 59

25  years before he died in March 2013, is informed and believes that Jeffrey never had

26  any awareness of the existence of an FBAR, and therefore any requirement to file

27  such FBAR.

28

2
COMPLAINT FOR ILLEGAL EXACTION

8.      Despite lack of evidence of willfulness on the part of Jeffrey, the IRS has concluded that Jeffrey's actions somehow merit the maximum FBAR penalty of 50% of the maximum value of his individual investment accounts in New Zealand for the year 2011 (the "**50% Willful FBAR Penalty**"), or $1,890,074.  The IRS's "assessment" of this 50% Willful FBAR Penalty contravenes the IRS's authority under 31 U.S.C. § 5321.  This "assessment" also constitutes an excessive fine and retaliation against Margaret, now 90 years old, for Jeffrey's individual accounts in New Zealand, the value of which were unknown to Margaret and her children (and not specifically the IRS), until shortly after Jeffrey's death in March 2013.

9.      Plaintiff is informed and believes the "assessment" of an FBAR penalty by the IRS for the failure to timely file an FBAR, and the payment of a portion of such penalty, is a jurisdictional prerequisite for filing this action pursuant to 28 U.S.C. § 1346(a)(2) to contest such determination (*i.e.*, a civil action against the United States to recover amounts erroneously or illegally assessed or collected).

10.      Accordingly, after the Examination Division determined the 50% Willful FBAR Penalty, Plaintiff requested an expedited "assessment" from the Examination Division.  Plaintiff informed the IRS in that request that this matter has caused Margaret's physical and mental health to rapidly deteriorate since the Examination first began in or around October 2016, and that although Plaintiff had cooperated fully with the IRS to date, if Plaintiff pursued the IRS' appeal process without such an expedited assessment, she might be precluded from participating in the inevitable judicial resolution of the disputed penalty.

11.      Promptly upon receipt of the erroneous notice of "assessment" of the 50% Willful FBAR Penalty, Plaintiff, on behalf of the Estate of Jeffrey, submitted an FBAR penalty payment of $4,878.95 for the calendar year 2011 (the "**Penalty Payment**"), and then a claim for a full refund of the same Penalty Payment, which is pending this Court's adjudication of the IRS's erroneous determination against the Estate of Jeffrey.

COMPLAINT FOR ILLEGAL EXACTION

**OPERATIVE FACTS**

12.    In 1919, Jeffrey was born in New Zealand, where he was raised and lived the first approximately 33 years of his life.  Jeffrey started his professional career as a woman's dress maker in New Zealand before moving to London and then to Canada where he met his wife, Margaret.

13.    In 1928, Margaret was born in Canada, where she was raised and lived the first approximately 26 years of her life before she married Jeffrey.

14.    In 1954, Jeffrey and Margaret (together, the "**Joneses**") were married in Canada and thereafter immigrated to the United States.

15.    After they immigrated to the United States in 1954, and for most of their careers after they immigrated to the United States, Jeffrey continued as a woman's dress maker and Margaret worked as a secretary.

16.    In or around 1963, Jeffrey retired as a dress maker to work exclusively on purchasing, repairing, and selling rental properties, which the Joneses began to purchase for investment purposes primarily in or around Glendale, California, and in Washington State.

17.    Since the time the Joneses immigrated to the United States, they have filed their U.S. income tax returns in good faith based on the best available information to them at the time.

18.    In 1969, Jeffrey and Margaret each became U.S. citizens, and hence, dual citizens of New Zealand and Canada, respectively.

19.    While living in the United States, the Joneses continued to own foreign checking, savings, and investment accounts in their respective native countries of New Zealand and Canada.  Some of these foreign accounts were held by Jeffrey and Margaret jointly, and some of these foreign accounts were held by them individually (*i.e.*, solely in one of the spouse's names).

20.    During his lifetime until shortly before his death, Jeffrey, being a very private person as it relates to his finances (which was not all uncommon for his

DOCS 120815-000003/3528278.1                                        CASE No. _2:19-CV-00173

generation), never informed Margaret and their children of how much he had saved and was available in four (4) foreign accounts held solely by Jeffrey in New Zealand, specifically: (i) one account at Morrison Kent Lawyers in Auckland ("**Morrison Kent**"); (ii) one account at Heartland Bank (formerly Southern Cross Building Society); and (iii) two accounts at ANZ Bank (collectively, the "**Jeffrey Accounts**").

21.     The Jeffrey Accounts were always held in the individual name of Jeffrey. They were never held in the name of a foreign corporation, trust, or some other foreign legal structure in order to disguise that Jeffrey was the true owner of the accounts.

22.     Subject to evidentiary support after a reasonable opportunity for further investigation or discovery, the Jeffrey Accounts likely originated (or were successor accounts to other New Zealand accounts) around World War II before Jeffrey moved to the United States in 1954, and were likely partially funded with an inheritance from Jeffrey's parents who died in New Zealand over 30 years ago.

23.     Margaret always knew that Jeffrey had some funds of his own in foreign accounts and only in his name in New Zealand, but she understood these foreign accounts to be possibly retirement funds, and otherwise had no specifics regarding the Jeffrey Accounts or their values.

24.     Margaret's discovery of the value of the Jeffrey Accounts shortly after Jeffrey died on March 11, 2013, greatly upset Margaret.  Margaret thought as a matter of trust that Jeffrey should not have kept such funds a secret from her, since they had lived a frugal lifestyle during Jeffrey's lifetime as if they did not have such funds available to them.

25.     When interviewed by the Examination Division, the daughter of Jeffrey and Margaret, Stephanie Flint, testified that when growing up, she was always told that the family did not have a lot of money and, as a result, had to take annual vacations from the family's residence in Ventura, California to nearby San Diego,

COMPLAINT FOR ILLEGAL EXACTION

California, as, insofar as Ms. Flint understood, Jeffrey and Margaret could not afford expensive vacations to such destinations as New Zealand where they still had family.

26.    Margaret is informed and believes, however, Jeffrey never kept the value of the Jeffrey Accounts a secret for the purpose of not paying tax or complying with any law.

27.    On February 27, 2012, Jeffrey executed a last will and testament of same date (the "**U.S. Will**") relating to his worldwide assets and which effectively revoked an earlier New Zealand will executed in 1982.  Under the terms of Jeffrey's U.S. Will, the Jones Family Trust dated October 26, 1972, was designated as the sole beneficiary of the Estate of Jeffrey and Margaret was designated as the Executor.

28.    On March 11, 2013, Jeffrey died at the age of 93.

29.    Up until the time of Jeffrey's death, Margaret had never heard of an FBAR, and based on Margaret's information and belief, neither had Jeffrey.

30.    At the time of Jeffrey' death, Margaret was aware of certain other accounts in New Zealand (*e.g.*, at Bell Gully) and Canada (*i.e.,* at the Royal Bank of Canada or "**RBC**"), which the Joneses held jointly, transparently and directly in the Joneses' names until Jeffrey's death (collectively, the "**Joint Accounts**").

31.    Upon Jeffrey's death, the Joint Accounts passed directly to Margaret individually by right of survivorship.

32.    Margaret herself also individually held several accounts at each of Bell Gully and RBC prior to Jeffrey's death (collectively, the "**Margaret Accounts**"), transparently and directly in Margaret's name.

33.    Up until the time of Jeffrey's death, neither Jeffrey nor Margaret ever repatriated to the United States funds in the Jeffrey Accounts, Margaret Accounts, or Joint Accounts, as it was the Joneses' mistaken but good faith belief that they would be subject to U.S. income taxation on such funds only if and when those assets were brought into the United States.

COMPLAINT FOR ILLEGAL EXACTION

CASE NO. _2:19-CV-00173

34.     In or around June 2013, on behalf of the Estate of Jeffrey, Plaintiff appropriately obtained legal advice for the primary purpose of determining how to handle the probate of the Jeffrey Accounts in New Zealand.  As a result, Plaintiff (and the Estate of Jeffrey) learned for the first time of the existence of an FBAR and that such FBARs were required to have been filed for: (i) the Jeffrey Accounts; (ii) the Margaret Accounts; and (iii) the Joint Accounts.

35.     Mr. William Burke was the Joneses' tax return preparer and tax advisor for the tax years 1984 to 2012, inclusive.

36.     Mr. Burke is an experienced tax return preparer, and has been a Certified Public Accountant ("**CPA**") licensed by the California Board of Accountancy since 1977.

37.     Mr. Burke was always aware since at least the tax year 1984 that Jeffrey was originally from New Zealand and Margaret was originally from Canada.

38.     Despite his years of practice as a CPA, not once, however, did Mr. Burke ever ask the Joneses about whether they held a bank or financial account in their home countries, or any other interest in a foreign account, or whether they earned any foreign source income.  This was never something the Joneses gave any thought to as the Joneses reasonably believed that none of their foreign income and funds was subject to U.S. tax or reporting, until repatriated from a foreign country to the United States.

39.      Margaret is informed and believes Mr. Burke had never heard of an FBAR or been aware of FBAR filing requirements prior to his second interview by the Examination Division on <u>May 29, 2018</u>.

40.     Because of, *inter alia*, the above, Margaret is informed and believes Jeffrey died never having heard of an FBAR or the related filing requirement, and thus, Jeffrey never knew of any legal duty to file so called FBARs.

41.     After Jeffrey's death in March 2013, Plaintiff sought tax counsel and shortly thereafter hired a new tax return preparer.  As a result, Plaintiff and the Estate

COMPLAINT FOR ILLEGAL EXACTION

DOCS 120815-000003/3528278.1                                                    CASE NO. _2:19-CV-00173

of Jeffrey learned for the first time of the existence of a FBAR and that such FBARs were required to have been filed.

42.    On March 24, 2014, Plaintiff, as Executor of the Estate of Jeffrey, executed a power of attorney for the New Zealand Guardian Trust Company Limited ("**NZGT**") to open probate proceedings and administer Jeffrey's estate in New Zealand.

43.    On June 5, 2014, NZGT opened probate of Jeffrey's U.S. Will in New Zealand with respect to the Jeffrey Accounts.  Because several New Zealand statutes provide that claims may be made against an estate during a period of up to six months (the "**Notice Period**"), NZGT could not distribute the assets of Jeffrey's estate in New Zealand until the end of the Notice Period or the final probate date (*i.e.*, December 5, 2014).

44.    On June 26, 2014, for the purpose of bringing the Estate of Jeffrey and Margaret into FBAR compliance, Margaret's new tax return preparer filed the only FBAR for Jeffrey (the "**Jeffrey 2013 FBAR**") and an original FBAR for the year 2013 for Margaret.  The Jeffrey Accounts and Joint Accounts were initially reported on the Jeffrey 2013 FBAR, while the Margaret Accounts were reported on the Margaret's original 2013 FBAR.

45.    On March 3, 2015, with the further assistance of tax counsel, and after proper due diligence and using the best available information at the time, Margaret came into further FBAR compliance, specifically for herself individually, by filing FBARs for the Margaret Accounts and Joint Accounts for the years 2008, 2009, 2010 and 2011, as well as amended FBARs for the years 2012 and 2013 (the latter two to update and/or add the Joint Accounts to Margaret's original FBARs for those years).

46.    On March 16, 2015, Margaret filed a submission under the Streamlined Domestic Offshore Procedures of the 2014 Offshore Voluntary Disclosure Program (the "**Streamlined Submission**") on behalf of herself individually for the purpose of

coming into full compliance on the Margaret Accounts and Joint Accounts, as reported on Margaret's original filed FBARs for the years 2008 through 2011, inclusive, and Margaret's amended FBARs for the years 2012 and 2013 (together with the years 2008-2011, the "**Covered FBAR Period**"). With the Streamlined Submission, Margaret paid a so called "5% miscellaneous penalty" (which is not provided for as a matter of law, but rather an additional amount prescribed by IRS procedures) of $156,795.26 based on the highest aggregate balance of the Margaret Accounts and Joint Accounts during the Covered FBAR Period.

47.     Also with the Streamlined Submission, Margaret submitted a certification of non-willfulness, signed under penalty of perjury, to report that her failure to report the Margaret Accounts and Joint Accounts and pay all tax due in respect of those accounts was the result of a good faith misunderstanding rather than any willful conduct on her part.

48.     At the time of the Streamlined Submission, it was unclear from the IRS instructions or otherwise, that a joint certification of non-willfulness could be filed on behalf of a deceased person, including Jeffrey. Furthermore, it is still unclear to Plaintiff under these circumstances whether a joint certification of non-willfulness may be filed for a deceased person.

49.     Further, at the time of the Streamlined Submission, no one, including Margaret, was in a position to readily substantiate the reasons for Jeffrey's non-willful conduct with regard to applicable U.S. tax and reporting obligations, especially considering the complexity and scope of information required for Margaret to make such a determination. Consequently, although Plaintiff is currently unaware of anything other than non-willfulness on behalf of Jeffrey, Margaret did not feel comfortable making the certification under penalties of perjury on behalf of the Estate of Jeffrey. Accordingly, the Jeffrey Accounts were not included in the Streamlined Submission.

COMPLAINT FOR ILLEGAL EXACTION

CASE NO. _2:19-CV-00173

50.     Beginning in October 2016, the Examination Division conducted a very thorough income tax and FBAR examination (the Examination) related to the Streamlined Submission and eventually determined that, as to income tax, Margaret (and the Estate of Jeffrey) were in compliance and actually entitled to an income tax refund for the tax year 2013.

51.     The Examination Division further sent a letter to Plaintiff, dated May 11, 2018, notifying the Estate of Jeffrey that it was also conducting a Title 31 examination related to Jeffrey (the "**Title 31 Examination**").

52.     During the Title 31 Examination, the Examination Division relied primarily on the following three items:

    a. Interview of the initial tax return preparer Mr. Burke, after which the Examination Division concluded that "*[e]ven though Mr. Burke may not have been very experienced regarding foreign tax and disclosure issues, Mr. Jones's failure to make appropriate disclosures prevented Mr. Burke from either addressing the issue or referring Mr. Jones to a more qualified foreign tax specialist.*"

    b. Interview of Mrs. Celia Guzman, former property manager for the Joneses' rental properties, who stated that certain of Jeffrey's New Zealand account statements were mailed for a period of time to Mrs. Guzman's address in Glendale, California, and that Jeffrey stated several years ago to Mrs. Guzman that "*this is between you and me.*"

    c. General hearsay statement provided by an employee of Morrison Kent to the New Zealand Inland Revenue service pursuant to a tax-treaty request under the U.S.-New Zealand Tax Treaty.  According to the Examination Division, in a letter from Inland Revenue (New Zealand) dated March 7, 2018, Mr. Ian Lowish said "*it is more than likely that in the early years, at the beginning of the arrangement, Mr. Jones would*

*have been made aware that he should take independent tax advice to meet his tax obligations in the United States.*"

## IMPOSITION OF THE FBAR PENALTY

53.     On July 26, 2018, by means of IRS Letter 3709 (Rev. 9-2015) of same date (the "**30-Day FBAR Letter**"), the IRS proposed, with no showing of willfulness, that Jeffrey (and therefore the Estate of Jeffrey) should pay the 50% Willful FBAR Penalty as to the Jeffrey Accounts.

54.     The IRS failed to show that Jeffrey's actions amounted to a "voluntary, intentional, violation of a known legal duty", as is required to sustain a "willful" penalty under 31 USC § 5321(a)(5).

55.     On August 27, 2018, Plaintiff submitted a written Protest of the proposed 50% Willful FBAR Penalty determined against Plaintiff (the "**Protest**") to the IRS, requesting Appeals review.

56.     On September 27, 2018, based on Margaret's rapidly deteriorating physical and mental health, and because it was estimated to be at least one year before IRS Appeals would even begin to consider the matter, with no guarantee they would do anything different than rubberstamp the Examination Division's determination,  Plaintiff withdrew her Protest and requested an expedited assessment against the Estate of Jeffrey so that "*Mrs. Jones, one of the primary witnesses in this case, can contest this matter in a fair, impartial, and hopefully more expeditious forum while she is still alive.*"

57.     On November 29, 2018, by means of IRS Letter 3708 (Rev. 10-2018) of same date, the Examination Division assessed the 50% Willful FBAR Penalty as to the Jeffrey Accounts, in the total amount of $1,890,074.

58.     On December 10, 2018, Plaintiff, on behalf of the Estate of Jeffrey, paid the Penalty Payment of $4,878,95.

59.     On December 11, 2018, Plaintiff, on behalf of the Estate of Jeffrey, filed a claim for refund of the same Penalty Payment.

COMPLAINT FOR ILLEGAL EXACTION

DOCS 120815-000003/3528278.1

CASE NO. _2:19-CV-00173

## COUNT I – ILLEGAL EXACTION

60.   Plaintiff repeats the allegations in paragraphs 1 through 59 as though set forth at length herein.

61.   Contrary to the IRS's contentions, Jeffrey's failure to file an FBAR for the year 2011 was unintentional and inadvertent, a good faith misunderstanding, the result of reasonable cause and mitigating circumstances, and certainly not "willful" (under any definition or construction of the term "willfulness"), in that, among other things:

   a. Jeffrey reasonably relied on the advice of competent and experienced (since 1972) tax return preparer Mr. Burke who nonetheless acknowledged to the IRS his lack of knowledge about FBAR filing requirements and universal failure to advise clients regarding same upon interviewing them;

   b. Jeffrey and Margaret disclosed to Mr. Burke the fact they had lived in New Zealand and Canada; and

   c. Plaintiff meets all four of the criteria justifying imposition of a penalty less than the maximum FBAR penalty – (i) Plaintiff has no history of past FBAR penalty assessments or criminal tax or Bank Secrecy Act convictions, (ii) no money in the Joneses' foreign accounts was from an illegal source or used for criminal purpose, (iii) Plaintiff has fully cooperated with the IRS and even self-reported the failure to report FBAR on receiving appropriate and knowledgeable advice, and (iv) the IRS did not impose a civil fraud penalty against Plaintiff for tax underpayment for the year in question.  See Internal Revenue Manual 4.26.16.6.6.1 (11-06-2015) and 4.26.16.6.6.2 (11-06-2015)

62.   The IRS has not shown and cannot show that Jeffrey actually knew or should have known of the duty to timely file an FBAR for the year 2011, in that, among other things:

COMPLAINT FOR ILLEGAL EXACTION

DOCS 120815-000003/3528278.1

CASE NO. _2:19-CV-00173

a. The statements attributed to Mrs. Guzman in the 30-Day FBAR Letter support the position that Jeffrey did not want his family to know about certain assets he held abroad, but do not provide any support for the contention that Jeffrey was hiding assets from the government or IRS;

b. The statements attributed to Mr. Ian Lowish are inadmissible hearsay and conjecture and statements of hoped-for New Zealand practice rather than reality; and

c. The IRS had no clear instructions or guidelines at the time Margaret filed the Streamlined Submission that a joint certification of non-willfulness could be filed on behalf of a deceased taxpayer such as Jeffrey.

63.    The 50% Willful FBAR Penalty that the IRS assessed in this matter is therefore an unreasonable and illegal penalty.

64.    The IRS's actions have a direct and substantial impact on the Plaintiff.

65.    The IRS's imposition of the 50% Willful FBAR Penalty and the sustaining of such penalty after Plaintiff's Protest has resulted in $4,878.95 being improperly paid, extracted, or taken from Plaintiff in contravention of the United States Constitution, a statute, or regulation, including but not limited to 31 U.S.C. § 5321 and the Fifth and Eighth Amendments to the Constitution.

66.    The IRS has received Plaintiff's Penalty Payment and should be ordered to return those funds.

67.    Plaintiff is entitled to recovery of the Penalty Payment because it is an illegal exaction by the IRS.

68.    Accordingly, Plaintiff hereby seeks the return of the money illegally exacted by the IRS.

COMPLAINT FOR ILLEGAL EXACTION

# PRAYER FOR RELIEF

**WHEREFORE, Plaintiff prays judgment in her favor and against Defendant as follows:**

1. For judgment in the amount of $4,878.95 as the amount having been illegally exacted from Plaintiff;

2. For pre and post-judgment interest as allowed by law;

3. For attorneys' fees and all costs of suit herein occurred; and

4. For such other further relief as the Court may deem just and proper.

DATED: January 8, 2019                    PROCOPIO, CORY, HARGREAVES & SAVITCH LLP


By:  */s/ Edward C. Walton*
      Edward C. Walton
      Patrick W. Martin
      Eric D. Swenson
      Attorneys for Plaintiff Margaret J. Jones, as Executor of the Estate of Jeffrey L. Jones

COMPLAINT FOR ILLEGAL EXACTION

DOCS 120815-000003/3528278.1                    CASE NO. _2:19-CV-00173